2021 IL App (1st) 181019-U

No. 1-18-1019

Order filed December 17, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 14822 |
| | ) | |
| MICHAEL WADE, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE PIERCE delivered the judgment of the court.
Justices Harris and Mikva concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for aggravated battery with a firearm is reversed and remanded for resentencing on the lesser offense of aggravated discharge of a firearm where the evidence failed to prove defendant guilty of aggravated battery with a firearm beyond a reasonable doubt. The trial court's denial of defendant's motion to suppress his inculpatory statement was proper because it was not the product of police coercion. ,

¶ 2    Following a jury trial, defendant Michael Wade was convicted of aggravated battery with

a firearm (720 ILCS 5/12-3.05(e)(1) (West Supp. 2013)) and sentenced to 28 years' imprisonment.

On appeal, defendant contends the trial court erred when it denied his motion to suppress his statement to police because the statement was obtained through police coercion. Defendant also contends the State failed to prove him guilty beyond a reasonable doubt because it failed to establish that the victim was shot, and if he was, that the gunshot was fired by defendant rather than his codefendant. We affirm the trial court's denial of defendant's motion to suppress but reverse his conviction for aggravated battery with a firearm and remand for resentencing on the lesser offense of aggravated discharge of a firearm.  .

¶ 3       In simultaneous but separate jury trials, defendant and codefendant Dayvon Bennett were tried on charges of first degree murder and aggravated battery with a firearm for the May 29, 2014, shooting incident that resulted in the death of Malcolm Stuckey and injuries to Marquis Carpenter and Timothy Robinson. Defendant was convicted of aggravated battery with a firearm for shooting Robinson but acquitted of the murder of Stuckey and aggravated battery of Carpenter. Bennett was acquitted of all charges.

¶ 4       Prior to trial, defendant filed a motion to suppress statements he made to police during a videorecorded interview following his arrest. In his written motion, defendant alleged, *inter alia*, that his statements were involuntary because they were obtained through psychological and mental coercion by the detectives who interviewed him. Defendant stated that he was held in custody for over 30 hours and repeatedly questioned by several detectives. Specifically, defendant asserted Detective John Halloran repeatedly suggested defendant should minimize his role in the offense by incriminating Bennett before Bennett incriminated him. Halloran also implied that if defendant spoke with him, the trial court would favorably consider defendant's cooperation while determining a more lenient sentence. Defendant further alleged that Halloran repeatedly violated

his personal space by sitting within inches of him or standing directly over him while yelling profanities and threats at him. Defendant argued that the totality of the circumstances rendered his statements involuntary in violation of his constitutional rights.

¶ 5    At the hearing on his motion to suppress, the State presented a stipulation that defendant was arrested on July 20, 2014, at 3:06 p.m. While in custody in the interview room, defendant slept on a mat on and off for 12 hours, was allowed to use the bathroom numerous times, was given food to eat at different times including a sandwich, chips, and McDonald's, and was given numerous bottles of water and cigarettes. The State presented another stipulation to the foundation for video clips defense counsel was going to play, and stated defendant was not alleging any threats or coercion occurred outside the video clips being shown in court.

¶ 6    Defendant played for the court seven video clips excerpted from the video recorded while he was in custody in the interview room. This court viewed those clips. In the first clip, police bring defendant into the room in handcuffs about 4:40 p.m. on July 20. The room is a small cinderblock room with no windows that contains only a bench attached to the rear wall. Defendant tells the officers his name and that he is 23 years old. An officer removes defendant's handcuffs and pats him down. The officers leave defendant alone in the room and close the door. In the second clip, at 6:09 p.m., Detectives Robert Garza and Kristi Battalini enter the room and advise defendant of his *Miranda* rights. Defendant agrees to speak with them. Defendant repeatedly denies any knowledge of or involvement in the shooting. In the third clip, at 1:56 p.m. on July 21, defendant is laying on a padded mat on the floor when Detectives John Murray and Frank Casale enter the room. Murray advises defendant of his *Miranda* rights. Defendant continues to deny his involvement in the shooting. Each of these three interactions lasted two to two and a half minutes.

¶ 7    In the fourth clip, at 3:20 p.m., Murray enters the room and tells defendant Bennett will be brought in from Statesville the following day. Murray tells defendant that people at the party where the shooting occurred knew Bennett and were talking to him there earlier in the day. Defendant asks Murray, "you're saying that he knows the people he was in the party with." Murray replies, "yeah." Defendant states, "I didn't know all that." Defendant continues to deny any knowledge of the shooting. Defendant tells Murray he gave an inculpatory statement in his prior armed robbery case and pled guilty. Defendant states that if he was involved in this shooting, he would have requested a lawyer and not spoken with police. This interaction lasted seven and a half minutes.

¶ 8    In the fifth clip, at 8:58 p.m., defendant is sleeping on the mat when Murray and Halloran enter the room. Halloran speaks in a loud and assertive tone. He tells defendant that the police put the puzzle together and it led to him. Halloran states, "you are going to jail, make no mistake." Halloran points out that defendant participated in three lineups the previous night and asks him why the police did not let him go home. Defendant replies he knows why. Halloran tells defendant that when they get to trial, Bennett will try to save himself and testify that defendant did it. Halloran states that if Bennett starts talking and defendant does not, Halloran will listen to what Bennett has to say. Halloran tells defendant that his girlfriend will be one of the first witnesses to testify against him. Halloran tells defendant that they did not arrest the wrong guy and that he is a "done deal." Halloran asks defendant if he understands the position he is in and tells him "it's up to you." Halloran states, "make no mistake about it, you are under arrest for murder, we're going to violate your f***ing parole, we're going to stick it up your ass." Defendant says nothing. Halloran tells defendant, "chew on that for a while," and leaves the room. This interaction lasted seven minutes. Halloran's language is laced with profanity. For most of the time, Halloran leans against a wall,

but he moves about the small room, occasionally close to defendant, and at one point sits next to defendant on the bench, mimicking defendant and Bennett sitting next to each other at trial. Halloran lightly taps defendant's front shoulder three or four times during the interview.

¶ 9    In the sixth clip, at 9:07 p.m., Halloran and Murray reenter the room. Halloran shows defendant his arrest report and the warrant for his parole violation and tells him, "you're f***d." Halloran tells defendant that if he does not "give up" Bennett, "we're going to end this case on you." Halloran tells defendant that if Bennett testifies against him at trial, and defendant then testifies against Bennett, the prosecutor will use defendant's prior armed robbery conviction to argue that his testimony is not credible because he is a convicted felon. Halloran further states, "[y]ou better start playing ball with us or you're kissing your f***ing ass goodbye for a very long f***ing time." Defendant states, "[y]'all ain't trying to help nobody." Halloran replies, "I never once said I am trying to f***ing help you" and "I'm telling you what the truth is." Defendant states that even if it was Bennett's idea and Bennett was the shooter, "I'm still going to jail." Halloran replies, "[y]ou still have a problem. You're absolutely right." Defendant then states, "[a]t the end of the day, y'all don't sentence me, the judge do." Halloran states that defendant is right, but that the judge bases the sentence on the prosecutor's recommendation which is based on information from the police about what defendant told them. Halloran tells defendant there is nothing he can do or say to help Bennett. He further states, "you can't f***ing do nothing to help yourself without going through me and [Murray]." Halloran tells defendant, "[y]ou better work with us instead of against us," and "[h]onestly, think about it. What other move do you have here?" Murray tells defendant, "I can't hold your hand anymore." Defendant states, "give me some time to think, man." Halloran calmly replies, "[o]kay, do your thing. You think all you want." Halloran asks defendant

if he needs to use the bathroom or needs anything. Defendant asks for a cigarette. Halloran says he will try to find him one and leaves the room. This interaction lasted about 10 minutes.

¶ 10     In the final clip, at 9:42 p.m., Halloran and Murray reenter the room. While discussing their investigation process with defendant, the three men are laughing together. Halloran tells defendant that if the police have the facts wrong, it is up to defendant to "straighten it out" or the police will go with the information they have. Halloran says he believes the shooting occurred because Bennett did not like someone at the party. Defendant asks Halloran if he tells them what happened, will they make a recommendation to the judge stating that he cooperated. Defendant states, "I know at the end of the day, either way it go I'm going to have to do some time." Murray tells defendant, "I can't make you any promises nor can he," but they will ensure his cooperation is noted. Halloran states, "[h]e told you, I can't make you a promise[,]" and it will be up to the prosecutor to decide what they want to do with defendant. Halloran tells defendant he believes the shooting was gang-related and it was easy for the police to identify Bennett by his nickname. Defendant states that he might be able to assist the detectives with another murder. Halloran replies, "this isn't let's make a deal here." The three men are laughing together as defendant responds, "I know it ain't let's make a deal" and "I'm going to jail regardless." Defendant asks if it would be helpful for him if he gave the detectives information about this shooting and another murder. Halloran responds that he will tell the prosecutor defendant cooperated with them in this case and was helpful with another case after they verify any information he gives them about the unrelated murder. This interaction lasted eight minutes. Defense counsel stopped the video and stated that defendant began making his incriminating statements at that point.

¶ 11    Following the videos clips, defendant called Detective Garza who testified that he interviewed Jazzma Mitchell on July 17, 2014. Mitchell told Garza she was in a vehicle with defendant on the night of the offense, and she identified defendant in a photograph. Based on information from Mitchell, police arrested defendant. Defendant was in custody in the police station from July 20 to 21, 2014. Garza and Battalini were the first detectives to interview defendant. Defendant participated in three lineups that evening viewed by three eyewitnesses to the shootings. None of the eyewitnesses identified defendant.

¶ 12    Defense counsel argued the police coercion started at the beginning of the interrogation when Garza began speaking about Bennett and told defendant he better explain things because he was getting the first shot and it was his chance to "clean it up." The detectives' "theme" was that defendant had better implicate Bennett or he would "go down" for the shootings himself. Counsel argued the coercion became "especially heightened" when Halloran implied defendant had been identified in a lineup, which was not true. Counsel acknowledged trickery or deceit was allowed during interrogations but claimed the detectives crossed the line. Counsel further argued the detectives inappropriately inferred defendant would receive a lesser sentence if he cooperated with them. In addition, counsel argued Halloran's demeanor was coercive where Halloran was loud and screaming, was in close physical proximity to defendant, repeatedly pointed at defendant with a piece of paper, and poked defendant in the shoulder a couple times. Counsel asserted that the totality of the circumstances established defendant's will was overborne where he was held in custody for 33 hours, repeatedly denied his involvement in the case, then confessed after the detectives used coercive tactics and made implied promises, rendering his statement involuntary.

Counsel acknowledged the court could consider that defendant was 23 years old rather than 16, and that he had prior contact with the criminal justice system.

¶ 13    The State argued that the detectives made it very clear that they were not making any specific promises of leniency to defendant. The State quoted defendant's statements that he knew he was going to jail and that the judge, not the detectives, would sentence him. The State pointed out Halloran told defendant, "this isn't let's make a deal" and Murray told defendant, "I can't make you a promise and nor can he." The State further argued that Halloran did not physically touch defendant, he leaned over defendant for only very brief moments, and he leaned against the wall or stood by the door most of the time. The State noted that when the interrogation occurred, defendant had been recently released from prison. It argued defendant was "quite capable" of speaking back to Halloran and confronted Halloran when he believed what Halloran said was wrong. The State argued defendant's demeanor showed he was not crying or visibly upset, but instead, he had a calm conversation with the detectives. Defendant asked for time to think, which the detectives gave him, and asked for a cigarette, which they also gave him. The State noted that defendant was laughing together with Halloran and Murray moments before he gave his confession. The State asserted there were no specific threats or promises of leniency, and no psychological coercion that overbore defendant's will.

¶ 14    The trial court found that, although Halloran's conversations with defendant were "salty and peppered with many profanities," they were "not improper per se." The court pointed out that trickery or deceit alone does not render a statement involuntary. It noted defendant was 23 years old and had prior experience with the criminal justice system from his prior felony conviction for armed robbery. The court stated that Halloran was "skilled" in what he said to defendant. Halloran

never said defendant would not be charged or that he would ensure defendant received a lesser sentence. The court found there were no promises of leniency and that defendant was repeatedly told it was his choice whether to cooperate with the police. The court stated, "I cannot say in any way, shape, or form that I believe the defendant's will was overborne in this matter." The court concluded that defendant's statements were voluntary and denied his motion to suppress.

¶ 15    At trial, Marquis Carpenter acknowledged he had two felony convictions from 2011 for possession of a stolen motor vehicle and possession of cannabis, a pending criminal contempt charge for failure to appear on a prior court date in this case, and a pending felony charge in another state. Carpenter testified that on May 29, 2014, he went to "CJ's" house in the 5700 block of South LaSalle Street for CJ's birthday party. When Carpenter arrived at the party about 10 a.m., his best friend, Timothy Robinson, was already there. Carpenter, Robinson, and some other people were in front of the house talking, drinking, and smoking "weed." Later that afternoon, Bennett, who was CJ's friend, arrived at the party in a two-door gray Alero driven by Jazzma Mitchell. Carpenter identified Bennett in court. Mitchell went on the front porch and began flirting with Robinson. Bennett was standing outside the house talking with CJ, about five feet from Carpenter. Bennett repeatedly looked at Carpenter, who looked back at Bennett. Carpenter had a nine-millimeter handgun in his back pocket that he carried for protection. About 15 minutes later, Carpenter observed Bennett retrieve an unknown object from inside the Alero. Bennett placed the object inside his front waistband and covered it with his shirt. Carpenter believed the object was a gun. Bennett returned to an area outside the house and continued speaking with CJ. About 15 minutes later, Bennett and Mitchell left CJ's house in the Alero. Shortly thereafter, Malcolm Stuckey arrived at CJ's house to meet with Carpenter, who was going to sell Stuckey's vehicle for him.

¶ 16    About 20 minutes after Bennett and Mitchell left the party, Robinson, who was standing on the porch, said to Carpenter, "[b]lack boy, there go them n***s." Robinson ran off the porch and down LaSalle towards 57th Street. Stuckey and Carpenter were standing in front of CJ's house. Stuckey was standing near the gate to the gangway and Carpenter was at the other end of the fence closer to the porch. Bennett emerged from the gangway to the front of the house wearing a blue hoodie over his head. Carpenter heard several gunshots but did not see a gun. Carpenter felt a pain in his left leg and realized he had been shot. Carpenter ran along the side of CJ's house towards the back of the house. Carpenter was facing the alley and observed Bennett standing 20 feet in front of him in the middle of the alley. Carpenter was then shot in the face and fell to the ground. He did not see where Bennett went. Carpenter never saw Bennett with a gun. Carpenter eventually got up and went to a house across the street for help. An ambulance arrived and transported Carpenter to Stroger Hospital where he remained for a month and a half. On June 23, 2014, Carpenter viewed a photo array and identified Bennett as the man who shot him. On July 22, 2014, Carpenter identified Bennett in a lineup.

¶ 17    Jazzma Mitchell acknowledged she was granted immunity in exchange for her testimony. Mitchell and Bennett were close friends, and she met defendant through Bennett. She identified both men in court. On May 29, 2014, Mitchell drove Bennett and defendant to CJ's party in her silver Alero. She parked in front of CJ's house. Mitchell and Bennett exited the vehicle. Mitchell went on the front porch and talked with Robinson, who was wearing an orange shirt. Bennett went inside CJ's house. About 10 minutes later, Mitchell and Bennett returned to her vehicle. Bennett directed Mitchell to drive to the Parkway Gardens apartments at 65th Street and King Drive because he and defendant wanted to buy "weed" but did not have enough money. At the

apartments, the three of them exited the vehicle. Mitchell spoke with someone she knew who was outside. She did not know where defendant and Bennett went. About 10 minutes later, defendant and Bennett returned to Mitchell's vehicle. The three of them reentered her vehicle and she drove back to CJ's house. Bennett directed Mitchell to park on another street. Bennett and defendant exited the vehicle while Mitchell remained inside on her phone. A few minutes later, Mitchell heard more than 10 gunshots. She ducked down inside her vehicle because she did not know where the shots were coming from. Bennett and defendant came running back and reentered Mitchell's vehicle. She drove them back to 65th Street and King Drive, dropped them off, and went to her grandmother's house.

¶ 18    On cross-examination, Mitchell confirmed defendant was with her and Bennett the first time they went to CJ's house, but defendant remained inside her vehicle. They returned to the party later to buy weed. Mitchell did not see defendant or Bennett with a gun.

¶ 19    Mandel Golden testified that about 6 p.m. on May 29 he was driving his vehicle southbound on LaSalle past 56th Street. His wife was in the passenger seat. As they approached the intersection with 57th Street, Golden observed a man with long dreadlocks wearing an orange shirt running northbound on LaSalle, heading towards them very fast. About 50 feet behind that man was a man wearing a sweatshirt with a hood over his head holding a gun pointed out in front of him. Golden could not see the second man's face. Golden heard several gunshots. The man in the orange shirt did not have a gun and Golden did not see anyone else in the area with a gun. Golden immediately made a U-turn and headed north on LaSalle to avoid the danger because one man was running towards him "and the other guy was shooting in his direction."

¶ 20    On cross-examination, Golden testified that in between the man in the orange shirt and the gunman was a third man who was running. That man headed westbound on 57th Street.

¶ 21    Danielle Golden testified that as she and her husband drove south on LaSalle approaching 57th Street, she observed a man with long dreads wearing blue jeans and "an orange-ish red-ish colored t-shirt" running north on LaSalle toward their vehicle. She heard a "pop, pop, pop" noise. She observed another man running eastbound on 57th Street. She observed a third man walking toward their vehicle pointing a gun straight out in front of him at the man in the orange shirt. Mrs. Golden observed a fourth young man standing on the west side of LaSalle Street in the 5700 block. He had just walked out from between two houses and appeared "[l]ike he didn't realize what was going on." The gunman turned towards the fourth man and shot him in the head. The fourth man "fell to the pavement lifeless." She told her husband that the young man was dead. Her husband made a frantic U-turn and drove away. The gunman was the only person with a gun. The man in the orange shirt and the man running on 57th Street did not have guns.

¶ 22    Lamenda Jones, CJ's mother, testified that Bennett, Carpenter, and Robinson attended the party at her house on May 29. Bennett was a childhood friend of CJ's. Carpenter and Robinson lived in the neighborhood. When Bennett came inside the house, Jones told him she was happy to see him and "I don't want no mess. Be safe." While cooking inside the house, Jones heard gunfire outside her door. She got down on the floor. She observed sparks from a gun but could not see who was shooting. Jones acknowledged she gave police a written statement in July 2014 stating that she looked through her open door and observed an arm with a dark-colored long sleeve extended towards the porch while firing a gun. Jones heard 14 or 15 gunshots. When the shooting

stopped, she ran outside and observed a young man shot in the head in her front yard. She also saw Carpenter crawling across the street "bleeding everywhere."

¶ 23    Paramedic Christopher Powers testified that about 6:15 p.m. on May 29 he responded to a call regarding a gunshot victim at 57th and LaSalle. Carpenter was bleeding significantly with gunshot wounds to his face and lower extremities.

¶ 24    Chicago police evidence technician Kamal Judeh testified that he arrived at the scene about 7 p.m. on May 29. Judeh recovered two .40-caliber fired cartridge casings in the alley behind the residence. He recovered a loaded nine-millimeter firearm in a vacant lot immediately north of the residence. He recovered six fired cartridge casings near the sidewalk north of the residence. He recovered five .40-caliber fired cartridge casings near the residence. A large trail of blood led from the residence to the porch of the house across the street. Another trail of blood led from the front of the residence to the vacant lot where there was a pool of blood. About 11:30 p.m., Judeh went to police headquarters and processed a gunshot residue kit on Robinson.

¶ 25    Detective Casale testified that in March 2015, a weapon which fired some of the cartridge casings recovered at the scene was recovered in an unrelated case.

¶ 26    Forensic scientist Aimee Stevens testified that the two cartridge casings recovered from the alley and two of the five casings recovered near the residence were fired from the .40-caliber firearm that was recovered in the unrelated case. The six casings recovered from the sidewalk north of the residence and three of the casings recovered near the residence were not fired from the recovered firearm but were all fired from the same .40-caliber firearm. None of the casings could have been fired from a nine-millimeter firearm.

¶ 27    The State presented a stipulation that forensic scientist Ellen Chapman analyzed the gunshot residue kit administered to Robinson and found Robinson did not discharge a firearm, and if he did, the particles were removed, not deposited, or not detected. The State presented a second stipulation that forensic scientist Angela Casehammer found no human DNA profile from swabs taken from the nine-millimeter firearm recovered from the vacant lot.

¶ 28    Assistant medical examiner Marta Helenowski testified that she performed an autopsy on Stuckey. Stuckey died from multiple gunshot wounds and the manner of death was homicide.

¶ 29    Detective Murray testified that on July 21, 2014, he had two conversations with defendant in an interview room at police headquarters. The first conversation included Detective Casale and the second conversation included Detective Halloran. Both conversations were video and audio recorded. The recorded conversations were published to the jury.

¶ 30    This court viewed the recordings. In the first conversation, Murray advises defendant of his *Miranda* rights. Defendant speaks with Murray and denies his involvement in the case. In the second conversation, Halloran attempts to convince defendant to tell them what happened on the day of the shooting. Defendant asks for time to think about it, which he is given. Defendant tells the detectives that he was not with Bennett and Mitchell the first time they went to CJ's house. Mitchell called defendant and said she and Bennett were going to pick him up because Bennett "got into it with somebody" and needed defendant's help. Over the phone, Mitchell and Bennett told defendant someone was "eyeballing" Bennett at the party, and a couple men were whispering with each other which made Bennett nervous. Bennett wanted defendant to return to CJ's house with him to be his "muscle" so no one would "f*** with him." Ten minutes later, Mitchell arrived in a silver Alero with Bennett in the back seat. Defendant got in the front passenger seat. At that

time, defendant did not know CJ or where CJ lived. They drove to the area of 57th and LaSalle and parked around the block from CJ's house.

¶ 31 Defendant states that he and Bennett exited the vehicle and walked through a field and a gangway. Bennett was walking in front of defendant. They did not cover their heads. Defendant states that he always carries his gun, a Glock 40, and Bennett also had a gun. As they exited the gangway, defendant saw Robinson, who was wearing an orange shirt and long dreads. Robinson looked at Bennett with a shocked expression. Robinson, Bennett, and defendant stared at each other for about 10 seconds. Robinson then ran northbound down LaSalle Street. Bennett yelled at Robinson, "what you running for." When Bennett reached the front of the house he started shooting. When defendant reached the front of the house, he saw a man fall to the ground. He did not see Bennett shoot that man. Bennett was not shooting at Robinson. Defendant observed Bennett chasing another man who jumped over a bannister. Defendant began chasing Robinson down the street and shooting at him. Defendant fired 15 or 16 shots at Robinson, emptying his gun. Defendant states he could see Robinson was "hit" because "of the way he running." Defendant could not tell where Robinson was hit. Defendant stands and demonstrates for the detectives how Robinson was limping as he continued running. Robinson was holding up his pants as he ran.

¶ 32 Defendant states that because his gun was empty, he ran back through the gangway heading to Mitchell's vehicle. He could still hear gunshots as he ran. Defendant observed Bennett circling around the house. Bennett stopped in the alley and fired two more shots at a man lying in the grass with blood coming out of his mouth. Defendant and Bennett reentered Mitchell's vehicle and Mitchell drove away from the scene. Defendant threw his gun into the lake later that day.

¶ 33    On cross-examination, Murray acknowledged defendant was not identified in a lineup, and when Halloran discussed the lineup during their interview of defendant it was an evidence ploy. He explained police use evidence ploys to try to elicit responses to their questions. Murray also acknowledged defendant had been in the interview room for about 30 hours when he made his inculpatory statements. Murray denied that he and Halloran implied to defendant that he would receive some sort of leniency if he cooperated with them. Murray explained they told defendant they would tell the prosecutor what defendant told them and that it would be up to the prosecutor to inform the judge about the evidence. Murray confirmed defendant had to rely on the police to provide him food while he was in the interview room, but explained defendant was told to knock on the door if he needed to use the bathroom or needed anything. Defendant was given a mattress that police are required to provide people who are in the interview room for a long time.

¶ 34    The jury found defendant guilty of aggravated battery with a firearm to Robinson, but not guilty of the murder of Stuckey and aggravated battery with a firearm to Carpenter.

¶ 35    Defendant filed a motion for judgment notwithstanding the verdict or a new trial arguing, *inter alia*, that there was no evidence Robinson was injured when defendant discharged a firearm in his direction, and that the trial court erred when it denied his motion to suppress his statements. The trial court stated that the evidence showed that, contemporaneous with defendant chasing Robinson and firing a weapon at him, Robinson began limping. The court noted it did not appear Robinson had twisted his ankle. The trial court found that the evidence was sufficient to support the jury's guilty verdict and denied defendant's posttrial motion. The trial court sentenced defendant to 28 years' imprisonment.

¶ 36    On appeal, defendant first contends the trial court erred when it denied his motion to suppress the inculpatory statements he made to Detectives Halloran and Murray because the statements were obtained through police coercion. Defendant contends the length and conditions of his confinement and the detectives' threats and promises of leniency rendered his statements involuntary. Specifically, defendant argues he was isolated in a small room for over 30 hours, he was dependent upon his interrogators for food, water, and use of the bathroom, and he was not provided a bed or reasonable place to sleep. Defendant claims Halloran used illegal tactics when he belligerently threatened to send defendant to prison if he continued denying his involvement in the offense and promised a favorable sentencing recommendation or reduction in charges if he confessed. Defendant asks this court to reverse the trial court's denial of his motion to suppress his statements and remand his case for a new trial.

¶ 37    The State responds that the trial court properly denied the motion to suppress because the totality of the circumstances demonstrates defendant's confession was voluntary. The State argues that defendant slept on and off for 12 hours on a mat, used the bathroom numerous times, and was given food, several bottles of water, and cigarettes. The State argues defendant understood what was happening and told the detectives he gave an inculpatory statement in his prior armed robbery case. The State asserts that, although Halloran used profanity and raised his voice, he did not threaten defendant or promise or suggest he would receive leniency in exchange for his confession.

¶ 38    Our review of the trial court's ruling on a motion to suppress statements presents questions of both fact and law. *People v. Richardson*, 234 Ill. 2d 233, 251 (2009). The trial court's factual findings are given great deference and will not be disturbed on review unless they are against the manifest weight of the evidence. *People v. Hughes*, 2015 IL 117242, ¶ 32. At a hearing on a motion

to suppress, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, and drawing reasonable inferences therefrom. *People v. Ballard*, 206 Ill. 2d 151, 162 (2002). The court's ultimate finding of voluntariness is a question of law which we review *de novo*. *Hughes*, 2015 IL 117242, ¶ 32. When reviewing the trial court's ruling on a motion to suppress, we may consider the evidence presented at trial as well as the evidence from the suppression hearing. *People v. Eubanks*, 2019 IL 123525, ¶ 61.

¶ 39    The test for voluntariness is whether the defendant made his statements freely and voluntarily, without any kind of compulsion or inducement, or whether his will was overborne at the time of his confession. *Hughes*, 2015 IL 117242, ¶ 31. In determining whether a confession is voluntary, the court must consider the totality of the circumstances in the case by weighing several factors including the defendant's age, experience, background, intelligence, education, mental capacity, and physical condition at the time of questioning. *Id.* Additional factors include whether *Miranda* warnings were given, the legality and duration of the detention, the duration of the questioning, and any mental or physical abuse by police, including threats or promises. *People v. Murdock*, 2012 IL 112362, ¶ 30. It is the State's burden to establish that the defendant's confession was voluntary by a preponderance of the evidence. *Hughes*, 2015 IL 117242, ¶ 31.

¶ 40    A confession obtained by deception or subterfuge is not invalid as a matter of law. *People v. Melock*, 149 Ill. 2d 423, 450 (1992). The use of deception is a relevant factor that may weigh against a finding of voluntariness, but it is only one factor to consider among the totality of the circumstances when determining voluntariness. *Id.* Similarly, a promise or suggestion of leniency does not render a confession inadmissible *per se*. *People v. Lee*, 2012 IL App (1st) 101851, ¶ 34.

To constitute a promise of leniency, the statement must include a suggestion of a specific benefit the defendant will receive if he confesses. *Id.*

¶ 41    Here, the record reveals defendant's confession was not coerced by the detectives, and therefore, was voluntary. Defendant's claim that the detectives promised him a favorable sentencing recommendation or a reduction in charges if he confessed is belied by the record which indicates no such promises were made. The video shows that when Halloran told defendant he "better start playing ball" with them, defendant stated, "[y]'all ain't trying to help nobody." Halloran replied that he "never once said" he was trying to help defendant and stated, "I'm telling you what the truth is." Defendant acknowledged that even if Bennett was the shooter, "I'm still going to jail." Halloran replied, "[y]ou still have a problem. You're absolutely right." Defendant then stated, "[a]t the end of the day, y'all don't sentence me, the judge do." Halloran replied that defendant was right, but the judge would base the sentence on the prosecutor's recommendation which would be based on information from the police about what defendant told them. Defendant stated, "give me some time to think," which the detectives allowed.

¶ 42    The next video clip shows defendant asked the detectives if he were to tell them what happened, would they make a recommendation to the judge stating that he cooperated. Before the detectives answer, defendant immediately acknowledged, "I know at the end of the day, either way it go I'm going to have to do some time." Murray expressly replied, "I can't make you any promises nor can he." Murray stated they would ensure defendant's cooperation was noted. Halloran also told defendant, "[h]e told you, I can't make you a promise." Halloran explained to defendant that it would be up to the prosecutor to decide what they wanted to do with defendant. Moments later, defendant asked Halloran and Murray if it would be helpful for him if he gave them information

about the shooting in this case and another unrelated murder. Halloran replied, "this isn't let's make a deal here." The video shows defendant, Halloran, and Murray laughing together as defendant responded, "I know it ain't let's make a deal" and "I'm going to jail regardless." Halloran then told defendant he would tell the prosecutor defendant cooperated with them in this case and was helpful with another case.

¶ 43    The record thereby indicates Halloran and Murray never promised or implied defendant would receive a lesser charge or more lenient sentence in exchange for his cooperation, and specifically told defendant they could not make any such promises. *Lee*, 2012 IL App (1st) 101851, ¶ 34. Moreover, the record shows defendant fully understood he would have to serve prison time even if he cooperated with the police, and that the length of his sentence would be up to the judge, not the detectives. Accordingly, the trial court's finding that the detectives made no promises of leniency that coerced defendant to confess is supported by the record and not against the manifest weight of the evidence. *Hughes*, 2015 IL 117242, ¶ 32.

¶ 44    Nor do we find any merit in defendant's claim that Halloran coerced him to confess by violating his personal space and belligerently threatening him. The video demonstrates defendant was in custody in a small interview room that contained only a single bench attached to the wall. For most of the interview, Halloran leaned against a wall, but he moved about the small room, occasionally close to defendant. At one point he sat next to defendant on the bench for a few seconds, mimicking defendant and Bennett sitting next to each other at trial. Halloran lightly tapped defendant's shoulder three or four times during the interview. There was no other physical contact between them. Throughout the interview, Halloran spoke in a loud and assertive tone and his language was laced with profanity. Halloran told defendant he was going to jail, which was

true as defendant was arrested for murder. Halloran also told defendant that if he did not "give up" Bennett, the police would "end this case on you." Halloran stated, "[y]ou better start playing ball with us or you're kissing your f***ing ass goodbye for a very long f***ing time." However, Halloran also told defendant that the police believed the shooting was Bennett's idea and that Bennett was their main target. The trial court found that, Halloran was "skilled" in what he said to defendant, and although his language was "salty and peppered with many profanities," his conversations with defendant were "not improper *per se*."

¶ 45    The record shows that, although Halloran's language was rough and he had an assertive tone and presence, he did not threaten defendant to coerce his confession. The video shows defendant was relaxed and at ease with the detectives. He was not afraid, upset, or visibly shaken. Defendant asked questions, acknowledged things he already knew, including that he was going to have to serve prison time, and engaged in a calm conversation with the detectives. Defendant even told Murray that he previously gave an inculpatory statement in his prior armed robbery case, thereby demonstrating his experience and knowledge of how the criminal justice system works. Defendant was laughing together with the detectives at two points during their final discussion, just moments before he made his statements. The record thus indicates that, based on the totality of the circumstances in this case, defendant's will was not overborn and he made his statements freely and voluntarily. *Hughes*, 2015 IL 117242, ¶ 31. Accordingly, we find that the trial court's denial of defendant's motion to suppress his statements was proper. *Id.* ¶ 32.

¶ 46    In reaching this conclusion, we give no consideration to defendant's additional argument that his confession was coerced because he was dependent upon the police for food, water, and use of the bathroom, and that they did not provide him with a bed or reasonable place to sleep.

Defendant did not raise these grounds before the trial court and has raised them for the first time in this appeal. Consequently, his argument based on these distinct grounds was not adequately preserved for review and is forfeited. *Id.* ¶¶ 45-47.

¶ 47 Defendant next contends the State failed to prove him guilty beyond a reasonable doubt because it failed to prove Robinson was shot, and if he was, that the gunshot was fired by defendant rather than Bennett. Defendant argues that there was no evidence Robinson was injured during the shooting, and that defendant's subjective belief that he shot Robinson was mere speculation. He further argues that Bennett fired shots at Robinson first while Robinson was closer to Bennett, and thus, it is more likely Robinson was shot by Bennett. Defendant concedes that his confession is sufficient to support a conviction for aggravated discharge of a firearm. He therefore asserts that this court should reduce his conviction from aggravated battery to aggravated discharge and remand his case to the trial court for resentencing on the lesser included offense.

¶ 48 As a preliminary matter, we reject defendant's assertion that the facts in this case are undisputed, rendering his guilt a question of law to be reviewed *de novo*. See *People v. Smith*, 191 Ill. 2d 408, 411 (2000) (where the facts were undisputed, the defendant's guilt was a question of law that was reviewed *de novo*). Whether Robinson was shot and whether defendant was the person who shot him were factual questions for the jury to determine. Accordingly, *de novo* review does not apply to this issue. See *People v. Loggins*, 2019 IL App (1st) 160482, ¶¶ 30-32.

¶ 49 When defendant claims the evidence is insufficient to sustain his conviction, this court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proved beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19

(1979)). This standard applies whether the evidence is direct or circumstantial and does not allow this court to substitute its judgment for that of the fact finder on issues involving witness credibility and the weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). Under this standard, all reasonable inferences from the evidence must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 50    As the trier of fact, the jury is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences therefrom. *Jackson*, 232 Ill. 2d at 281. In weighing the evidence, the jury is not required to disregard the inferences that naturally flow from that evidence, nor must it search for any possible explanation consistent with innocence and raise it to the level of reasonable doubt. *Id.* We will not reverse a conviction based upon insufficient evidence unless the evidence is so improbable or unsatisfactory that there is reasonable doubt as to defendant's guilt (*People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011)), nor simply because defendant claims a witness was not credible or that the evidence was contradictory (*People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009)).

¶ 51    To prove defendant guilty of aggravated battery with a firearm as charged in this case, the State was required to show that, in committing a battery, he knowingly discharged a firearm, other than a machine gun or a firearm equipped with a silencer, and caused injury to another person, specifically, that he shot Robinson about the body. 720 ILCS 5/12-3.05(e)(1) (West Supp. 2013). Here, viewed in the light most favorable to the State, the record reveals that the evidence was insufficient for the jury to find that defendant caused injury to Robinson by shooting him about the body, a necessary element of the offense of aggravated battery with a firearm. 720 ILCS 5/12-3.05(e)(1) (West Supp. 2013)**.** In his videotaped statement, which was published to the jury,

defendant expressly stated that Bennett was not shooting at Robinson, but instead, was chasing another man. Defendant stated that he chased Robinson northbound on LaSalle and fired 15 or 16 shots at Robinson, emptying his gun. Defendant further stated that he thought Robinson was "hit" because of the way he was running. In the video, defendant stood and demonstrated how Robinson was limping as he continued running. Defendant stated that he did not know where Robinson was hit. Defendant also stated that he threw his gun into the lake later that day.

¶ 52   In addition to defendant's statement, the State presented evidence that police recovered 13 .40-caliber fired cartridge casings from the scene – 2 in the alley, 5 in front of CJ's house, and 6 near the sidewalk north of CJ's house. Ballistic testing established that the casings in the alley and two of the casings from the front of the house were fired from a .40-caliber gun subsequently recovered in an unrelated case. Testing also established that three of the casings near CJ's house and all six of the casings recovered north of the residence were fired from the same gun, but not the recovered gun. Carpenter testified Bennett was standing in front of him in the alley immediately before Carpenter was shot in the face. Carpenter's testimony was corroborated by defendant's statement that he observed Bennett stop in the alley and fire two shots at a man lying in the grass with blood coming out of his mouth. From this evidence the jury could infer that Bennett fired the recovered weapon in front of the house and in the alley, and defendant fired all the shots north of the house while chasing Robinson northbound on LaSalle from the gun he threw into the lake.

¶ 53   Notably absent from the State's case was any evidence establishing that Robinson was injured as a result of being shot at by defendant.  Robinson did not testify. The State did not produce any medical evidence to establish that Robinson was injured.  There was no eyewitness testimony as to Robinson's injury.  There was similarly no circumstantial evidence that demonstrated that an

injury occurred, such as blood on the pavement, or on Robinson's clothing. Likewise, there was no physical evidence that established that Robinson was injured. Those that had an opportunity to observe Robinson after the shooting, did not testify that Robinson was noticeably injured while they interacted with him. The evidence technician testified that he tested Robinson's hands for gunshot residue four and a half hours after the shooting occurred at the police station. According to the evidence technician, Robinson was in an interrogation room with Detective Garcia. However, neither Detective Garcia nor the evidence technician testified that Robinson was suffering from any injuries in their presence.

¶ 54 The State is constitutionally required to prove every element of a crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). Here, the State failed to prove that Robinson was injured and therefore failed to prove defendant guilty of the offense of aggravated battery with a firearm beyond a reasonable doubt.

¶ 55 Defendant urges that should we find the evidence insufficient to convict him of the offense of aggravated battery with a firearm, that we should reduce his conviction to aggravated discharge of a firearm. See Ill. S. Ct. R. 615(b)(3); see also *People v. Guerrero*, 2018 IL App (2d) 160920, ¶ 71. Defendant admits that the evidence in this case established that he shot at Robinson while Robinson was running down LaSalle Street and that this action constitutes aggravated discharge of a firearm.

¶ 56 A person commits aggravated discharge of a firearm when he or she knowingly discharges a firearm in the direction of another person. 720 ILCS 5/24-1.2(a)(2) (2014). "Aggravated discharge of a firearm is an included offense of aggravated battery with a firearm." *People v. Boyd*, 307 Ill. App. 3d 991, 999 (1999). In his videotaped confession, defendant confessed to

shooting 15 or 16 bullets in Robinson's direction. This evidence alone is sufficient to establish a finding of aggravated discharge of a firearm. As such, we remand to the trial court for resentencing consistent with this order.

¶ 57    For these reasons, we affirm the trial court's denial of defendant's motion to suppress, reverse defendant's conviction for aggravated battery with a firearm, enter judgment on the lesser offense of aggravated discharge of a firearm and remand for resentencing on that finding.

¶ 58    Affirmed in part; reversed and remanded in part.